# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

MAJED SUBH,                          :
                                     :
                Plaintiff,           :
                                     :
        v.                           :       C.A. No. 07-479-SLR-LPS
                                     :
WAL-MART STORES EAST, LP,            :
                                     :
                Defendant.           :

# REPORT AND RECOMMENDATION
## ON MOTION FOR SUMMARY JUDGMENT

On August 2, 2007, the plaintiff, Majed Subh ("Subh" or "Plaintiff"), filed the present

employment discrimination lawsuit against Defendant Wal-Mart Stores East, L.P. ("Wal-Mart"

or "Defendant") alleging discrimination and retaliation in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* (Docket Item ("D.I.") 1) In his First Amended

Complaint (the "Complaint"), Subh also raises state law discrimination claims, pursuant to 19

Del. C. §711, as well as intentional infliction of emotional distress. (D.I. 3)[1] For these alleged

violations of federal and state law, Subh seeks compensatory and punitive damages and other

associated costs and relief. (*Id.*) Subh's Complaint incorporates the allegations contained in the

charges of discrimination he filed with the Delaware Department of Labor ("DDOL") and the

Equal Employment Opportunity Commission ("EEOC"). (D.I. 1, 3)[2]

---

[1]Plaintiff commenced this suit *pro se*, then retained counsel on or about June 12, 2008.
Plaintiff's original and amended complaints were filed during the period when he was
unrepresented.

[2]Plaintiff filed charges of discrimination with the DDOL and EEOC on June 14, 2006 and
January 16, 2007, respectively. (D.I. 50 at A22-23, A27-28) These charges were dismissed by

On August 8, 2007, this case was assigned to the Honorable Sue L. Robinson, who then,

on September 13, 2007, referred the case to me.  (D.I. 4)  Pending before the Court is the Motion

for Summary Judgment filed by Wal-Mart.  (D.I. 48)  For the reasons that follow, I recommend

that Defendant's Summary Judgment Motion be granted with respect to all of Plaintiff's claims.[3]


## BACKGROUND[4]

### Plaintiff's Employment

Subh worked as a photo center technician in Wal-Mart Store #5436 in Wilmington,

Delaware from December 20, 2005 – just before its January 2006 opening – until March 3,

2007.[5]  (D.I. 3; D.I. 49)  Subh, a German citizen and resident alien in the United States, is a white

_____

the DDOL with a "no cause" finding, findings which were subsequently adopted by the EEOC. (D.I. 50 at A24-26, A51-52)

[3]Pursuant to the September 16, 2008 Order (D.I. 44), Plaintiff had ample opportunity to take discovery – yet it does not appear that Plaintiff deposed any witnesses.  (*See* D.I. 49, 52-54.) Moreover, while Subh contends in his Answering Brief that various customers or others witnessed certain alleged incidents and behavior, Subh has offered no witness testimony or independent corroboration of his claims.  (*See* D.I. 52, 53.)  In the one instance where Plaintiff has produced evidence to support a claim – a declaration of a Michelle Filling, who appears to have been a customer who overheard another customer make racist comments to Subh in December 2006 in front of Assistant Manager William Sumey, a Caucasian male – that evidence is an unsworn declaration from a witness who was not timely identified by Subh, and thus was not subject to deposition by Wal-Mart.  (D.I. 52; D.I. 53 at B49-50; D.I. 54)  I will not consider the Filling declaration – although even if I did, Plaintiff would still not meet his burden to defeat Defendant's summary judgment motion.

[4]The Court has gleaned the following factual background from the parties' summary judgment filings.  Where there are disputes of fact, all reasonable inferences are drawn in Plaintiff's favor.  As is evident from my recommendation to grant summary judgment in favor of Defendant, however, I do not believe there are any genuine issues of material fact.

[5]Plaintiff transferred to Wal-Mart Store # 5450 in Northeast, Maryland on March 3, 2007. (D.I. 49; D.I. 50 at A180)  Shortly thereafter, on April 19, 2007, Wal-Mart terminated Subh's

male of Palestinian heritage.[6]  (D.I. 3; D.I. 50 at A168-69)

**Wal-Mart's Policies**

At the start of his employment with Wal-Mart, Plaintiff, like all company Associates,

received an Associates Guide setting forth Wal-Mart's company policies.  (D.I. 49 at 4; D.I. 50 at

A55-56, A87)  Subh also received extensive computer-based training on Wal-Mart's personnel

policies.  (D.I. 49 at 5; D.I. 50 at A87-89)  As a Wal-Mart employee, Subh was thus subject to

numerous relevant policies.

*Harassment/Discrimination/Inappropriate Conduct Policy*

According to company policy, "Wal-Mart does not tolerate discrimination in employment

on the basis of race, color, age, sex, sexual orientation, religion, disability, ethnicity, national

origin, veteran status, marital status or any other legally-protected status."  (D.I. 50 at A54, A57-

63)  Relatedly, the policy states that: "Wal-Mart will not tolerate unlawful harassment or

discrimination of, or inappropriate conduct directed at any Associate . . . by anyone, be it another

Associate, Supervisor, Manager . . . or Customer/Member."  (D.I. 50 at A57)

---

employment for gross misconduct after he allegedly physically threatened a co-manager back at Store #5436.  (D.I. 49 at 1, 4; D.I. 50 at A94)  Although the parties have addressed Plaintiff's allegations surrounding his transfer to Store #5450 and eventual dismissal in their briefs (D.I. 49; D.I. 52, D.I. 54), these events are not alleged in the Complaint, nor the discrimination Charges he filed with the DDOL or EEOC, and are not part of the instant case.  Instead, Plaintiff has initiated a second lawsuit against Wal-Mart and Ruth McPherson concerning the events that allegedly led to his transfer and termination, styled *Subh v. Wal-Mart Stores, Inc.*, C.A. No. 08-410-SLR-LPS.  Therefore, I will not address the transfer and dismissal-related allegations here.

[6]Although Defendant contends that pursuant to the EEOC's Guidelines Subh's race is "white" (D.I. 49 at 4 & n.4; D.I. 50 at A206-12), Subh alleges the discrimination he suffered resulted from him being a "Palestinian Arab" (D.I. 52).

*Open Door Communications Policy*

Wal-Mart has an established Open Door Communications Policy, which encourages Associates to bring any suggestions, observations, problems, or concerns regarding the company to the attention of management. (D.I. 50 at A64-69) This policy makes clear that there will be no retaliation for Associates who utilize the open door process, stating "Wal-Mart will take no adverse action against any Associate based solely on the Associate's participation or lack of participation in any Open Door activity." (D.I. 50 at A65, A68; *see also id.* at A55-56.)

*Coaching for Improvement Policy*

Wal-Mart's procedure for disciplining employees is called the Coaching for Improvement Policy. (D.I. 49; D.I. 50 at A82-86) In general, this policy provides for a first level Verbal Coaching for an initial infraction, followed by a second-level Written Coaching for a subsequent infraction. (D.I. 49; D.I. 50 at A83) The third level is referred to as a Decision-Making Day coaching, which provides the Associate with a day off of work, with pay, for the Associate to decide whether he or she will make the required improvements in his/her behavior or performance. (D.I. 49; D.I. 50 at A83-84) Termination is the fourth step of the process. (D.I. 49; D.I. 50 at A84) Management may deviate from the steps or skip steps at the company's discretion. (D.I. 49; D.I. 50 at A82-83) For example, certain forms of behavior constitute gross misconduct, which are grounds for immediate termination and would not require use of the coaching process. (D.I. 49; D.I. 50 at A82-84)

*Breaks, Meal Periods, and Days of Rest Policy*

Wal-Mart has also established a Breaks, Meal Periods, and Days of Rest Policy ("Breaks Policy"), to which it expects its Associates to strictly adhere. (D.I. 50 at A70-73) Subh has

acknowledged that Wal-Mart consistently enforced this policy. (D.I. 50 at A178) Pursuant to the Breaks Policy, Associates are required to take "full, timely, uninterrupted breaks and meal periods." (D.I. 50 at A70) Associates who work more than six hours must take a meal period of no less than 30 minutes, while Associates who work between three and six hours must take a 15 minute break. (*Id.* at A70-73) Wal-Mart's meal break policy is consistent with Delaware law. (D.I. 49 (citing 19 Del. C. § 707)) "Each occasion an Associate fails to clock in or out for a meal period, misses a meal period, takes a meal period that is too long or too short, or takes a meal period that is untimely will be measured as a 'meal period exception.'" (D.I. 50 at A72) If an exception occurs that is the fault of the Associate, the Associate will receive a Coaching. (*Id.*) Moreover, "[a]dvancement to the next level of Coaching will occur when additional break and/or meal period offenses occur." (*Id.*)

### *The Working Off the Clock and Time Clock Policies*

Wal-Mart further prohibits its hourly Associates from working off the clock. (D.I. 50 at A74-81) The Working Off the Clock policy reiterates Wal-Mart's commitment to "compensating every Associate for the work they perform." (*Id.* at A74) Hourly Associates are required to clock in prior to commencing work, and clock out during meal periods and at the conclusion of their scheduled shift. (*Id.*) Should an Associate fail to take his/her required meal break, the computer system that operates the cash registers will "lock out" the Associate for 30 minutes, rendering the Associate unable to use the registers. (*Id.* at A79) Relatedly, the Time Clock Policy warns that an hourly Associate who performs work without properly recording his or her time violates the policy and will be subject to disciplinary action, up to and including termination. (*Id.* at A74-75, A78-81)

5

**Subh's Allegations Of Discrimination**

Subh's Complaint recites that "[t]he actions of the employees and management of defendant Wal-Mart were motivated by unlawful gender, race, and national origin discrimination, including sexual harassment, and by unlawful retaliatory motive based upon Mr. Subh's having exercised his rights to be free from discrimination, in violation of Title VII protections against discrimination and retaliation in employment." (D.I. 3 ¶11)  Subh explains that he was "subjected on numerous occasions to yelling and inappropriate verbal comments and other inappropriate behavior by coworkers, including but not limited to Susan Ferrette, Cathy Brown, and others (including an individual . . . []Marvin[] [Williams] who worked in the electronics department . . .)," which conduct was reported by Subh to, among others, the store's co-manager Frank Durst, a Caucasian male. (*Id.* at ¶¶5, 6)

Given that discovery has now closed and this case has reached the stage of summary judgment briefing, Subh must point to some evidence in the record to support his allegations.  In an effort to do so, Subh testified that Associate Cathy Brown, an African-American female, began harassing him in January 2006. (D.I. 50 at A179; D.I. 52 at 8)  According to Subh, Brown was rude to him, yelled at him in front of customers, and made comments concerning his immigration to the United States – stating that "[y]ou don't come from another country and work here in the U.S.A., you don't know the people in this country," that "[y]ou don't come from another country and work like this," and that "[y]ou don't come from another country and teach us how to work." (D.I. 50, A1 Durst Aff. at ¶¶3, 5, A95-96, A179-85)  Subh also complains that Brown struck him on the shoulder with a telephone in or about May 2006. (D.I. 50, A1 Durst Aff. at ¶¶3, 5, A191, A195)  Despite a customer witnessing this incident (D.I. 50 at A193-194),

6

Subh says no investigation was performed. (*See* D.I. 52 at 9)

When Subh complained to Durst, Durst recommended that Subh take his complaints to the assistant photo store manager, Susan Ferrette, a Caucasian female. (D.I. 53 at B1a)  When Subh did so, Ferrette told Subh: "Well, you know how [C]athy is. She likes to yell." (D.I. 53 at B1a)  When Subh again asked Durst to intervene and resolve the co-workers' conflict, Durst met with the employees on May 9, 2006 and presented the options as: he could fire both employees; both could quit; one of them could transfer out of the photo lab into another department; or, they could each put aside their differences and work together. (D.I. 50, A1 Durst Aff. at ¶5, A186-87; D.I. 53 at B1b)  Moreover, after complaining to three managers about Brown, on May 10, 2006 Subh contacted Wal-Mart's Ethics Hotline to complain about the same issues. (D.I. 50 at A191-92; D.I. 53 at B47-48)  In response to that call, and at Durst's request, Sharon Johnson, a district manager, came and met with Subh at the store in May 2006 regarding Brown. (D.I. 50 at A192-93)  In response to Subh's complaints regarding Brown, Johnson commented that "[w]e could give you any time a coaching, both of you," and "[b]oth of you, we could give you a coaching for being disrespective to each other." (D.I. 50 at A192-193).  Johnson further remarked: "Obviously, [Brown] is going to continue yelling at you, and people are people, we cannot change them." (D.I. 50 at A192; D.I. 53 at B1c.)

Subh submits that Durst, Ferrette, and Johnson failed to comply with Wal-Mart's anti-discrimination and anti-harassment policy and failed to conduct a meaningful investigation into his issues with Brown – all of which compelled him to file his first Charge of Discrimination.

(D.I. 52)[7]

As another example of discrimination, Subh complained that Marvin Williams, an

electronics department supervisor, although not Subh's boss, mocked his name by calling him

"Magic" (as opposed to Majed).  (D.I. 50 at A199-201; D.I. 53 at B5-7)


**Wal-Mart's Contentions Regarding Alleged Discrimination**

With respect to Subh's contentions regarding his co-worker, Brown, Wal-Mart responds

that Subh's complaints were directed to what he described as her generally loud demeanor, rather

than any remarks about his race or national origin.  (D.I. 49; D.I. 50 at A22-23, A29-50)  Subh

himself has testified in his deposition that Brown in "general [] yells a lot and [] has an

unpleasant way of saying things" (D.I. 50 at A183), and that she frequently raised her voice to

*everyone* that she encountered, from management to customers.  (D.I. 50 at A184-85)[8]

Wal-Mart further argues that even if Brown did make the comments Plaintiff attributes to

her about the fact that he came from another country, such comments were not objectively

offensive.  If Brown did tell Subh that he cannot come from another country and expect the work

to be the same, it is more likely she was referring to Plaintiff's recent emigration from Germany,

_____

[7]Subh testified that in June 2006 Wal-Mart failed to promote him based on his national origin when he applied for the vacant position of Photo Manager.  (D.I. 53 at B19-19a) However, because Subh does not mention promotion in the Complaint, or in the Charges he filed with the DDOL and the EEOC, nor was this within the scope of those agencies' investigations, I will not address this as part of his claims.

[8]Brown denied making any inappropriate remarks about Plaintiff's national origin (D.I. 50 at A187-89) and contended that Plaintiff hit her with a telephone (D.I. 50, A2 Durst Aff. at ¶4, A6 Durst Aff. at Ex. B)  Plainly, there is a dispute of fact on these points, though not, in context, a material one.

where he had lived and worked for a number of years, and not his national origin. (D.I. 49; D.I. 50 at A95-96) Moreover, Plaintiff's own testimony relates that the sentiments Brown allegedly expressed were isolated and occurred perhaps three times over the course of about four months, at a time when Subh and she were regularly working together. (D.I. 50 at A179-83) Plaintiff has also not alleged that Brown's comments – coming from a co-worker who had no authority with regard to the terms and conditions of Subh's employment – unreasonably interfered with his ability to perform his duties; moreover such remarks were wholly unconnected to any adverse employment actions, discussed below. (D.I. 49)

Wal-Mart also challenges Subh's contention that it failed to investigate his concerns regarding Brown. The record shows that Subh's complaints were investigated by Wal-Mart store management promptly after Plaintiff complained and corrective measures were taken. (D.I. 50 at A1-8 Durst Aff., A96-96) Durst and Sumey met with Subh and Brown on May 9, 2006 to discuss their respective complaints. (D.I. 50, A1-8 Durst Aff.) Durst investigated Subh's and Brown's claims but he found no witnesses to any inappropriate comments or the incident with the telephone. (D.I. 50, A1-8 Durst Aff.) Durst informally counseled *both* Associates to act respectfully toward one another and behave professionally at work, particularly in front of customers; *neither* employee, however, received any formal discipline. (D.I. 50, A1-3 Durst Aff., A7-8, A95-96, A190) In order to resolve what he regarded as a personality conflict, Durst gave both Subh and Brown the option of transferring out of the Photo Center. (D.I. 50, A1-3 Durst Aff., A7-8, A95-96, A187) However, both indicated they wanted to stay in the Photo Center and would attempt to put aside their differences and work together. (D.I. 50, A1-3 Durst Aff., A7-8, A95-96, A186-90) Neither individual was formally coached or disciplined in any

9

way as a result of this meeting.  (D.I. 50, A1-3 Durst Aff., A7-8, A95-96, A190)  Plaintiff admits

that, thereafter, Brown made no further comments about his coming from Germany and working

differently in the United States.  (D.I. 50 at A95-96, A194-95)

      With respect to Subh's meeting with Johnson, Wal-Mart relates that Johnson listened to

Plaintiff's concerns about Brown, which were the same concerns he had raised with Durst.  (*See*

D.I. 49; D.I. 50 at A192-93)  Plaintiff did not identify any offensive or derogatory comments

related to his race or national origin made by Brown (or any other Wal-Mart employee).  (*See*

D.I. 49; D.I. 50 at A192-93)  Johnson concluded, as Durst had, that there was simply a

personality conflict between Subh and Brown, and she cautioned Plaintiff that Wal-Mart

expected all Associates to be respectful.  (*See* D.I. 49; D.I. 50 at A192-93)

      With respect to Subh's allegations regarding Williams, Wal-Mart responds that Plaintiff

had no reporting relationship to Williams, and that Williams' mispronunciation of his name was

not discrimination based on Plaintiff's race or national origin.  (D.I. 49)

**Subh Files First Charge Of Discrimination With The**
**DDOL And EEOC Based On Race And National Origin**

      After allegedly failing to achieve satisfaction through Wal-Mart's internal complaint

mechanisms, on June 14, 2006, Plaintiff filed his first Charge of Discrimination with both the

DDOL and EEOC.  (D.I. 50 at A22-23)  Plaintiff's first Charge alleged that he was discriminated

against based on his race and national origin.  (*Id.*)  The Charge form includes boxes to identify

what the discrimination is based upon: race, color, sex, religion, national origin, retaliation, age,

disability, or other.  Plaintiff only checked the boxes for race and national origin.  (*Id.*)  As to the

10

adverse employment action alleged, the Charge recites "[h]arassment, terms and conditions of employment, and discipline." (*Id.*)

The Charge recites that Plaintiff was discriminated against when he was "subjected to yelling and inappropriate verbal comments by his co-workers," and that "rather then Respondent addressing the situation Respondent threatened him with discipline." (*Id.*) In support of his Charge, Plaintiff also completed several questionnaires provided by the DDOL. While Plaintiff contends that the administrative record identifies not only Brown, but also Ferrette, Williams, and Johnson as discriminating against and harassing Subh because of his race and national origin (*see* D.I. 50 at A45-47; D.I. 52), Wal-Mart submits that all or most of the background provided focused on the events surrounding Subh's interactions with Brown (*see* D.I. 49; D.I. 50 at A29-50).

In resolving the charge, the DDOL concluded that the "Charging Party has failed to meet his evidentiary burden demonstrating illegal race and/or national origin discrimination occurred." (D.I. 50 at A24) The DDOL issued its Final Determination and Right to Sue Notice on November 20, 2006. (*Id.* at A24-25) Thereafter, the EEOC, in adopting the DDOL's no cause finding, issued its Dismissal and Right to Sue Notice on May 8, 2007. (*Id.* at A24-26)

**Additional Allegations Of Discrimination**

According to Subh, he suffered from additional racial and national origin discrimination after filing his first charge. In September 2006, a customer began harassing Subh using inflammatory and discriminatory language, referring to him as a "sand nigger." (D.I. 53 at B8) Assistant managers Ferrette and Robert Pickle responded to the customer's request for a

11

manager. (*Id.*) In front of both managers, the customer repeated the slur. (*Id.*) Rather than having the customer removed or rebuked, Ferrette and Pickle took Subh into a training room and told him that "[i]f you don't get quicker, we will terminate you. We will fire you and fire all the photo lab crew with you." (*Id.*) In response to the slur, Pickle also told Subh that "[t]his is the way the people in this country are," and that "both of them . . . Ferrette and . . . Pickle, threaten[ed] . . . to . . . fire[] [me] if I don't get quicker and if I don't digest this statement of the customer." (*Id.* at B9-10, B20) Subh thereafter assisted the customer. (*Id.* at B10) Subh complains that the managers condoned the customer's comment. (D.I. 52; D.I. 53 at B9-10, B20) Moreover, Subh complains that Pickle called him a "rock star" in response to Subh stating that he knew plenty of Americans who did not use such derogatory terms. (D.I. 53 at B9) Subh was "offended" by Pickle's comment. (*Id.*)

In response to Subh's discrimination claims based on the alleged slur, Wal-Mart disputes the facts, adding: "If plaintiff's account of the incident is accepted, he was called a derogatory name by one unidentified customer on the one occasion that he served this customer over the course of 15-16 months of employment in a retail establishment, which serves thousands of people on a daily basis. Plaintiff does not claim to have ever encountered the customer again, nor does he claim that this isolated episode altered the terms of his employment." (D.I. 50 at A9-11, Ferrette Aff.; D.I. 54 at 6) Wal-Mart further responds that it cannot control the behavior of each customer entering its stores, nor can management expel every rude customer. (D.I. 49) With respect to Pickle's alleged comments, Wal-Mart says that Subh never reported them to Wal-Mart, and that they were not encompassed within the investigations conducted in connection with his administrative charges of discrimination. (D.I. 49; *see also* D.I. 50 at A22-25, A27-28,

A51-52.)

**Subh's Allegations Of Retaliation**

According to Subh, subsequent to filing the first Charge his supervisors and co-workers

"continued to subject [him] to inappropriate yelling, verbal comments, inappropriate behavior,

unjustified disciplinary 'coachings,' unjustified criticisms based upon his alleged failure to take

breaks when he was following company policy for attending to customer needs, and in general

Wal-Mart employees continued to harass and retaliated against [him]." (D.I. 3 ¶7)

It is undisputed that following the filing of his first Charge Subh received three

disciplinary "coachings." The first was issued on July 13, 2006 because Subh was disrespectful

to Assistant Manager David Amakobe, an African-American male. (D.I. 50 at A90) Subh had

telephoned the front desk seeking Photo Center Manager Sumey because of a mechanical

malfunction. (*Id.*; D.I. 53 at B11-13) Amakobe asked Subh to report to him in person. (D.I. 50

at A90) When Subh did not respond quickly enough, Amakobe issued a "coaching." (*Id.*) Subh

contends this discipline was part of Wal-Mart's retaliation against him, following his June 14,

2006 first Charge of Discrimination.

On August 7, 2006, Wal-Mart disciplined Subh again, this time with a written coaching

by store co-manager McPherson, a Caucasian female. (D.I. 50 at A91-92) McPherson believed

that Subh had failed to take a lunch break. (*Id.*) Subh contends, however, that he had taken his

break, but had simply forgotten to log out of Wal-Mart's timekeeping system because he left to

use the restroom. (D.I. 53 at B14-17) Subh complains that Wal-Mart did not consistently

enforce its policies but instead selectively punished Subh for not complying with its published

break requirements in order to retaliate against him. (D.I. 53 at B17-18)

Then, on October 31, 2006, Wal-Mart disciplined Subh concerning an argument he had

with Demetrice Smith, an African-American male who worked part-time in the Photo Center

with Plaintiff. (D.I. 50 at A93)  After Smith began raising his voice at Subh over a work issue,

Subh sought the assistance of managers. (*Id.*; D.I. 53 at B2-4)  The managers instead identified

Subh as the instigator and issued him discipline. (*Id.*)  Subh also complains that Wal-Mart failed

to investigate or interview the two witnesses he identified. (D.I. 53 at B4)

**Wal-Mart's Response To Retaliation Contentions**

Wal-Mart's response to the allegations of retaliation turns largely on pointing to how little

is in dispute about the conduct that gave rise to Subh's three coachings and the absence of

evidence that Wal-Mart treated other Associates – who do not share Subh's race or national

origin – any differently than they treated him.

Plaintiff speculates that, because his first formal coaching did not occur until several

weeks after he filed his first Charge of Discrimination, it must have been retaliatory.  However,

Wal-Mart points out that Plaintiff had been informally counseled regarding his behavior from the

very beginning of his employment with Wal-Mart. (D.I. 50, A1-3 Durst Aff., A7-8, A9-11

Ferrette Aff., A95-96)  More importantly, his first formal coaching did not come from any of his

direct supervisors, whom he now accuses of retaliation, but from Assistant Manager Amakobe.

(D.I. 54)  Plaintiff does not allege that Amakobe knew of his Charge of Discrimination. (*Id.*)

Nor does Plaintiff dispute the facts underlying Amakobe's coaching of Subh for being

disrespectful and insubordinate. (*See* D.I. 52 at 5-6; D.I. 54.)

The written coaching he received – weeks later from a different supervisor – was for a

documented instance of Plaintiff's violation of Wal-Mart's Breaks Policy. (D.I. 50 at A12-15

McPherson Aff.; D.I. 54)  It is undisputed that Plaintiff could have been immediately terminated

for this integrity violation.  Subh received this written coaching for attempting to falsify his time

clock entries. (D.I. 50 at A91-92)  Plaintiff had requested that McPherson manually alter the

time clock records to show that he had taken a lunch break, claiming that his badge had failed to

work when he attempted to clock out for lunch.  (*Id.*)  McPherson reviewed the time entries and

discovered that Plaintiff had not taken a lunch break at all.  (*Id.*)  In acknowledging the written

coaching, Plaintiff's written comments concluded "for the future this will not take place again

and take my break the right time."  (*Id.* at A91)  Plaintiff admits that he frequently flouted Wal-

Mart's meal break policy, though he says it was due to his dedication to customer service taking

priority over his responsibility to follow company policy.  (*See id.*; D.I. 50 at A9-11 Ferrette Aff.;

A203; D.I. 52 at 14-15)

 According to Wal-Mart, Subh received his third-level discipline, a Decision-Making Day

coaching, months later from yet another manager, for engaging in a heated argument with Smith

on the sales floor.  (D.I. 50 at A93)  On October 29, 2006, Smith was helping a customer when

Plaintiff interfered, believing that Smith was not using the proper envelope.  (D.I. 50 at A12-17

McPherson Aff.)  An argument ensued in full view of customers and other Associates.  (*Id.*)

Witnesses reported that both men had yelled at one another.  (*Id.*)  Both men then received a

coaching for arguing on the sales floor.  (D.I. 50 at A93, A99)  By Plaintiff's own account, Smith

never made any inappropriate comments directed to Subh's race or national origin.  (*Id.* at A199)

 Wal-Mart explains that the company was supportive of Plaintiff's development and that

Plaintiff had a long history of policy infractions before formal mechanisms of discipline were

utilized.  (D.I. 50 at A1-3 Durst Aff., A9-11 Ferrette Aff., A95-96; D.I. 54)  It is undisputed that

Plaintiff routinely violated Wal-Mart's Breaks Policy by failing to take the breaks required by

law. (D.I. 50, at A9-11 Ferrette Aff., A12-15 McPherson Aff., A95-98, A203) Plaintiff's first

supervisor, Assistant Manager Sumey, was the first to recognize that Plaintiff violated this policy

and worked off the clock. Sumey did not utilize the formal coaching process for this violation

because he did not believe that Plaintiff understood the need to take breaks. (D.I. 50 at A95-96)

Sumey, therefore, educated Plaintiff about the policy and warned him to adhere to it in the future.

(*Id.*) Plaintiff's subsequent supervisor, Ferrette, had to constantly remind Plaintiff to take his

meal breaks. (D.I. 50 at A9-11 Ferrette Aff.) On more than one occasion, Ferrette observed

Plaintiff clock-out for lunch but then resume working, off the clock. (*Id.* at ¶5) Plaintiff also

frequently worked unapproved overtime, staying at the Photo Center long after its 10 p.m.

closing and the 11 p.m. conclusion of his shift. (*Id.* ¶ 6) When informal warnings failed to result

in an improvement in Plaintiff's compliance, Wal-Mart began to utilize formal discipline. (D.I.

50 at A12-15 McPherson Aff., A90-93; D.I. 54)

Each of Plaintiff's diverse managers recognized Subh's performance issues and

counseled him to improve. (*See* D.I. 49 at 18; D.I. 50 at A1-21.) Moreover, no witness has

corroborated Plaintiff's claims of discrimination or retaliation. On the contrary, each of the

incidents that resulted in Plaintiff being disciplined – by different, diverse members of

management – was well documented. (D.I. 54)


**Subh Files Second Charge, Alleging Retaliation**

On January 16, 2007, Plaintiff filed his second Charge of Discrimination with the DDOL

and EEOC. (*Id.* at A27-28) Plaintiff's second Charge alleged that he was retaliated against as a

consequence of having filed his first Charge. (*Id.*) Again, the Charge form includes boxes to

identify whether the discrimination is based upon race, color, sex, religion, national origin,

retaliation, age, disability, or other.  This time Plaintiff checked just the box for retaliation.  (*Id.*)

As to the adverse employment action alleged, the Charge recites "[d]iscipline."  (*Id.* at A-27)  In

resolving the Charge, the DDOL concluded that the "Charging Party has failed to establish the

required causal connection between his participation in a legally protected activity and the

Respondent's later disciplinary actions," and issued its Final Determination and Right to Sue

Notice on May 31, 2007.  (*Id.* at A51)  Thereafter, the EEOC, in adopting the DDOL's no cause

finding, issued its Dismissal and Right to Sue Notice on August 8, 2007.  (*Id.* at A51-52)


**Additional Allegations Of Retaliation**

Subh also explains that Wal-Mart's records show that on April 19, 2007, he reported

specific instances of McPherson's retaliation against him following the filing of his first Charge

(D.I. 53 at B36), but Wal-Mart performed no investigation into his complaint.  Subh offers that

the company records show that the complaint was closed shortly thereafter without any action

being taken.  (*Id.*)

According to Wal-Mart, the record also shows that in February 2007, Plaintiff was

suspended for an incident in which he was rude and unhelpful to a customer.  (D.I. 50 at A12-15

McPherson Aff.)  The customer had requested only a CD containing her photos, but Plaintiff

seemed to be attempting to charge her for prints.  (*Id.*)  The customer complained about Plaintiff

to customer service, stating it was not the first time she had encountered problems with him.

(*Id.*; D.I. 50 at A16-18)  Following an investigation, McPherson sent Plaintiff home for the next

two days until the store's manager returned from a trip and determined the appropriate discipline.

(D.I. 50 at  A14 McPherson Aff. ¶8; A196-98)  Given Subh's Decision-Making Day coaching,

under its policies Wal-Mart could have terminated Plaintiff for this February 2007 incident.  (D.I.

50 at A14 McPherson Aff. ¶8)  Again, however, Sharkey and McPherson exercised their discretion and gave Plaintiff one more chance and only suspended his employment.  (D.I. 50 at A14 McPherson Aff. ¶¶8-9)

**Sexual Harassment**

Although not referenced in either of Subh's Charges filed with the EEOC or DDOL, Subh complains that during his employment he "experienced the unwanted sexual advances of [Associate] Tamik[ia] Miller [("Miller")]."  (D.I. 3 ¶8)  Subh explains Miller began sexually harassing him, and harassing him on the basis of his national origin, in front of other Associates as well as managers.  (D.I. 50 at A101; D.I. 52 at 12)  Subh complained to Durst, and also contacted Wal-Mart's Ethics Line to report the harassment.  (*Id.* at A100-102)  Subh says Wal-Mart took no action, compelling Subh to contact Wal-Mart's Ethics Hotline again on January 29, 2007.  (*Id.*; D.I. 53 at B35)  During a lengthy interview, Subh told Wal-Mart Case Specialist Dee Higuera that he was suffering a "hostile work environment [which] is the result of supervisor and management toleration of . . . ongoing sexual and national origin harassment." (*Id.*)  Subh also noted that Miller "mock[ed] his accent."  (D.I. 50 at A101)  Wal-Mart took no action until February 12, 2007.  (D.I. 50 at A105)  While Wal-Mart ultimately investigated Subh's complaints of harassment and found his allegations were supported, Miller's employment was not terminated until March 1, 2007.  (*Id.* at A166)

Wal-Mart agrees that in late January and into February 2007, Plaintiff called Wal-Mart's Ethics Hotline and alleged that a co-worker in the Photo Center, Miller, sexually harassed him and made derogatory comments about his ethnicity.  (*See Redbook Investigation*, D.I. 50 at A100-65)  Wal-Mart therefore promptly conducted an internal "Redbook" investigation, headed

18

by Sharkey, in February 2007. (*Id.*) After speaking with a number of witnesses, Sharkey

concluded that Miller had made inappropriate comments to Subh about his accent and had said

that she wanted to have children with him. (*Id.*) Witnesses also reported that Subh had been a

willing participant in conversations with Miller about having children together and that the two

often joked around. (*Id.*; D.I. 50 at A139, A144, A148-49) Nonetheless, because Subh's

complaints were substantiated in part, on March 1, 2007 Wal-Mart terminated Miller for gross

misconduct. (D.I. 50 at A111, A166)

## LEGAL STANDARDS

A grant of summary judgment is appropriate only where "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." Federal Rule of Civil Procedure 56(c). The moving party bears the burden

of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co.,*

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). If the moving party has carried its

burden, the nonmovant must then "come forward with specific facts showing that there is a

genuine issue for trial." *Id.* at 587 (internal quotation marks omitted). The Court will "draw all

reasonable inferences in favor of the nonmoving party, and it may not make credibility

determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S.

133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475

U.S. at 586-87; *see also Podobnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (party

opposing summary judgment "must present more than just bare assertions, conclusory allegations

or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).

However, the "mere existence of *some* alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment;" a factual dispute is genuine

only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The non-moving party's

failure to offer colorable or significantly probative evidence for an essential element on which it

has the burden of proof entitles the moving party to summary judgment. *See id.* at 249-50;

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).


## DISCUSSION

### There Is A General Lack Of Admissible Evidence Supporting Plaintiff's Claims

Defendant moves for summary judgment because Subh has failed to offer sufficient

admissible evidence in support of his Title VII claims, and, accordingly, there are no genuine

issues of material fact, necessitating judgment in favor of the Defendant. I agree.

The only evidence Subh has attempted to offer for his claims consists of his pleadings and

various attachments, including transcript excerpts from his own deposition testimony,

questionnaire forms, and certain of his own self-created notes and correspondence. None of

these documents, however, establish any violation of his rights or support a claim for damages.

Subh's own uncorroborated accounts that wrongdoing occurred, without any evidence in support

of those claims, are not sufficient to establish a genuine issue of material fact and overcome

summary judgment. *See, e.g., Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 414 (3d Cir.

1999) (deeming unsupported allegations of discrimination based solely on plaintiff's personal

20

beliefs to be irrelevant); *Longmire v. Wyser-Pratte*, 2007 WL 2584662, at *11 (S.D.N.Y. Sept. 6,

2007) (granting summary judgment on hostile work environment claim against plaintiff, who

"relie[d] exclusively on his own conclusory allegations – which [were] wholly and uniformly

uncorroborated"); *Shramban v. Aetna*, 262 F. Supp. 2d 531, 536 (E.D. Pa. 2003) (holding that

plaintiff failed to produce enough evidence beyond her allegations and deposition testimony to

create a sufficient issue of fact to be resolved by a jury), *aff'd*, 115 Fed. Appx. 578 (3d Cir.

2004); *see also generally Union Ins. Soc'y of Canton, LTD v. William Gluckin & Co., Inc.*, 353

F.2d 946, 952-53 (2d Cir. 1965) (noting that affidavits submitted in support of or in opposition to

motion for summary judgment must be rejected under Federal Rule of Civil Procedure 56(e)

unless they contain admissible evidentiary facts); *Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc.*,

826 F.2d 1335, 1339 (3d Cir. 1987) (recognizing that "[s]ummary judgment, of course, looks

only to admissible evidence"); *Maldonado v. Ramirez*, 757 F.2d 48, 50-51 (3d Cir. 1985) ("[Rule

56(e) requires that] affidavit must be made on personal knowledge, must set forth such facts as

would be admissible in evidence[,] and must show affirmatively that the affiant is competent to

testify to the matters stated therein . . . . [T]he affiant must ordinarily set forth facts, rather than

opinions or conclusions . . . [because an] affidavit that is essentially conclusory and lacking in

specific facts is inadequate.") (internal quotation marks and citations omitted); *Bowers v. Rector

and Visitors of Univ. of Va.*, 2007 WL 2963818, at *5 (W.D. Va. Oct. 9, 2007) ("It is axiomatic,

that Rule 56(e) requires that any affidavit offered to support, or to oppose, a motion for summary

judgment must present admissible evidence; it must not only be based on the affiant's personal

knowledge but it must show that the affiant possesses the knowledge asserted.").

Thus, while Plaintiff's deposition testimony, on issues on which he is competent to

testify, is admissible evidence in support of portions of his claim, here – for reasons I will discuss

below – it is insufficient to meet Plaintiff's burden to avoid summary judgment. Moreover, Plaintiff has not submitted any affidavits presenting admissible evidence; it only appears that Plaintiff submits self-created notes or correspondence in support. Plaintiff needs to have adduced more evidence – such that a reasonable factfinder could return a verdict for him – but the record is devoid of it.

### Exhaustion Of Administrative Remedies

Title VII requires exhaustion of administrative remedies prior to filing suit in federal court. *See* 42 U.S.C. § 2000e-5(e)(1); *McDonnell Douglas*, 411 U.S. at 798. "A Title VII plaintiff in a 'deferral state' such as Delaware must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful conduct." *Lacy v. National R.R. Passenger Corp.*, 254 Fed. Appx. 934, 936 (3d Cir. 2007), *cert. denied*, --- U.S. ---, 129 S.Ct. 623, --- L.Ed.2d --- (2008). The purpose of this requirement is to provide the EEOC the chance to investigate, mediate, and take remedial action with respect to the claimed discriminatory event. *See Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398 (3d Cir.1976). The scope of a civil complaint in federal court, once a right-to-sue letter is issued by the EEOC, is "defined by the scope of the EEOC investigation which can reasonably be expected to grow out of a charge of discrimination, regardless of the actual scope of the EEOC investigation." *Tillman v. Pepsi Bottling Group, Inc.*, 538 F. Supp. 2d 754, 778 (D. Del. 2008) (internal quotation marks omitted). Moreover, "[t]he relevant test in determining whether [Plaintiff] was required to exhaust [his] administrative remedies, therefore, is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984). Otherwise, the claim is

22

barred.  It is worth noting, however, that "[c]ourts have allowed claims not specifically

mentioned in the EEOC charge where there was a close nexus between the facts supporting the

claims raised in the charge and those in the complaint."  *Tillman,* 538 F. Supp. 2d at 778; *see*

*also Gooding v. Warner-Lambert Co.,* 744 F.2d 354, 358-59 (3d Cir. 1984) (noting "sound and

established policy that procedural technicalities should not be used to prevent Title VII claims

from being decided on the merits").

Here, there is no dispute that Subh exhausted his administrative remedies with respect to

his claims of racial and national origin discrimination and retaliation.  While Wal-Mart contends

that Subh failed to exhaust with respect to each of the other Title VII claims he asserts in the

instant suit, I find that he did exhaust with respect to his claim of hostile work environment.

Before turning to the merits of the exhausted claims, however, I explain why I agree with Wal-

Mart that Subh failed to exhaust the administrative remedies that were available to address his

claims of gender discrimination and sexual harassment.


### *Discrimination on the basis of gender*

While Subh alleges generally in his Complaint that Wal-Mart was motivated by unlawful

gender discrimination (D.I. 3 at ¶11 ("The actions of the employees and management of

defendant Wal-Mart were motivated by unlawful *gender*, race, and national origin discrimination

. . . .")) (emphasis added), it is not entirely clear that he is, in fact, pursuing such a claim (*see* D.I.

52 at 20 ("Subh's Title VII claims encompass race and national origin discrimination, a hostile

work environment, and retaliation.")).  Neither the Complaint nor his opposition brief identify

incidents of alleged animus based on gender.  (D.I. 3, 52)  Most importantly, neither of Plaintiff's

DDOL or EEOC Charges alleged gender discrimination -- just race and national origin

discrimination in the first Charge, and just retaliation in the second Charge. Even construing the

Charges broadly, they do not encompass gender discrimination claims. Given Subh's failure to

exhaust administrative remedies with respect to gender discrimination, I recommend that

Defendants's motion for summary judgment be granted as to this claim.

### Sexual Harassment

Nowhere in Subh's administrative Charges does he suggest that he was the victim of any

sort of sexual harassment. The Charge forms include boxes for identifying that the

discrimination is based upon "sex," but Plaintiff only checked the boxes for race and national

origin in his first Charge and checked only retaliation in his second Charge. Thus, it is clear from

the face of both charges, as well as the DDOL's resolution of those charges, that Plaintiff did not

raise, and the DDOL never investigated, a claim for sexual harassment.[9]

Even assuming, however, that Plaintiff exhausted his administrative remedies, I would

still recommend granting Defendant's motion for summary judgment with respect to the sexual

harassment claim. To prevail on a Title VII sexual harassment claim, a plaintiff must show that

(1) he suffered intentional discrimination because of his sex; (2) the discrimination was severe or

pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would

detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of

respondeat superior liability. *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.

---

[9]Subh's Complaint does explicitly allege he "experienced the unwanted sexual advances
of [Associate] Tamik[ia] Miller." (D.I. 3 ¶8)  Moreover, Subh evidently "provided extensive
details of Ms. Miller's sexual harassment . . . to the EEOC." (D.I. 52; D.I. 53 at B55-57)
Plaintiff included in his Appendix what appears to be a (Sexual) Harassment Questionnaire,
dated February 2, 2007, that he had provided to the DDOL on February 8, 2007, ostensibly in
connection with his second Charge. (D.I. 3 ¶ 8; D.I. 53 at B55-57)

1990). Fatal to Plaintiff's claim is the fact that once Wal-Mart learned of his allegations, it investigated them, found that Miller had done at least some of what Subh alleged, and terminated her. *See Knabe v. Boury Corp.,* 114 F.3d 407, 412-13 (3d Cir. 1997) (affirming summary judgment for employer because remedial action taken by management after being notified of alleged sexual harassment was prompt and reasonably calculated to prevent further harassment). Miller's termination occurred within two months of Wal-Mart having received Plaintiff's complaint. Plaintiff's attempts to analogize the instant case to that discussed in *Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007) ("[W]e have . . . denied summary judgment in favor of an employer when there was evidence that the employee's supervisor knew about the harassment and did nothing for three months, despite other evidence that the alleged harasser's supervisor later took immediate action upon learning of the harassment"), fail because here there is no admissible evidence in the record to support an inference that Wal-Mart "did nothing" for months subsequent to learning of Subh's allegations.

**Discrimination On The Basis Of Race And National Origin**

The Court's role in evaluating a motion for summary judgment in a discrimination case is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987)

Title VII prohibits an employer from discriminating against any individual on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff does not distinguish between his race and national origin claims and relies upon the same set of facts in

support of both.  He claims that the discipline he received at Wal-Mart was motivated by the fact

that he is of Middle Eastern descent.  (D.I. 50 at A168)  Thus, to establish his discrimination

claims, Subh must show that Wal-Mart intentionally discriminated against him on the basis of his

race or national origin.

"A plaintiff may prove national origin or race discrimination by direct evidence as set

forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-46, 109 S. Ct. 1775, 104 L. Ed. 2d 268

(1989), or indirectly through the familiar burden-shifting framework set forth in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Shah v. Bank*

*of America*, 2009 WL 415619, at *5 (D. Del. Feb. 18, 2009).  "Direct evidence is evidence

sufficient to allow the jury to find that the decisionmakers placed substantial negative reliance on

[race or national origin] in reaching their decision." *Id.* (internal quotation marks omitted).

During his deposition, Plaintiff testified to a litany of incidents and complaints in an attempt to

support his claim.  But Plaintiff has no direct evidence of discriminatory animus or motive.

Plaintiff has not identified a single comparator Associate who was treated differently than him.

I next turn to the *McDonnell Douglas* burden-shifting framework to examine whether

Subh can prove intentional discrimination by inference.  *See* 411 U.S. at 802; *see also Texas*

*Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252 (1981).  Under this analysis, a plaintiff

must establish a prima facie case of discrimination by showing that: (1) he belongs to a protected

class; (2) he suffered an adverse employment action; and (3) the circumstances of the adverse

employment action give rise to an inference of unlawful discrimination such as might occur when

a similarly situated person not of the protected class is treated differently.  *See McDonnell*

*Douglas*, 411 U.S. at 802; *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  If the plaintiff

establishes a prima facie case of discrimination, the burden of production shifts to the defendant,

who must "articulate some legitimate, nondiscriminatory reason" for its treatment of the plaintiff. *McDonnell Douglas*, 411 U.S. at 802; *Fuentes*, 32 F.3d at 763. If the defendant produces a sufficient reason for its actions, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the employer's rationale is pretextual. *See McDonnell Douglas*, 411 U.S. at 804; *Fuentes*, 32 F.3d at 763. It bears emphasis though that "throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination *always* rests with the plaintiff." *Fuentes*, 32 F.3d at 763 (emphasis added).

Therefore, once the defendant has articulated a nondiscriminatory reason for its actions, the plaintiff must point to *some* evidence, direct or circumstantial, that the defendant's proffered reasons are merely a pretext for discrimination. *See Fuentes*, 32 F.3d at 763-64. That is, the plaintiff must point to some evidence from which the "factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000). "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes*, 32 F.3d at 764 (internal citations omitted). Thus, to make a sufficient showing of pretext, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's reason that "a reasonable factfinder *could* rationally find them unworthy of credence." *Id.* at 765 (internal quotation marks omitted).

Here, Subh has satisfied the first two prongs of the *McDonnell Douglas* test: he has

27

offered evidence that he belongs to protected racial or national origin classes and that he suffered adverse employment actions (discipline). But I recommend that Defendant's summary judgment motion be granted with respect to his race and national origin discrimination claims because Subh has failed to make even a prima facie showing on the third prong: whether the "circumstances of the adverse employment action give rise to an inference of discrimination." I conclude that Subh has produced no evidence, either direct or circumstantial, supporting his claim that the discipline he received from Wal-Mart occurred under circumstances that give rise to an inference that he suffered from discrimination motivated by racial animus or animus based on his national origin.

Subh failed to respond to the summary judgment motion with evidence that could establish that employees outside the protected class were treated more favorably; that is, he identified no similarly-situated non-Arabs who were treated differently and better than himself. While Plaintiff criticizes Wal-Mart for failing to identify comparators, it is the discrimination plaintiff's burden to do so. *See Burdine*, 450 U.S. at 258-59 ("*McDonnell Douglas* teaches that it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally.").

Subh also contends that the company consistently failed to enforce its own policies and that its selective enforcement against him is evidence of intentional discrimination. Wal-Mart's anti-discrimination and anti-harassment policies are unequivocal: "Wal-Mart will not tolerate unlawful harassment or discrimination of, or inappropriate conduct directed at any Associate . . . by anyone, be it another Associate, Supervisor, Manager . . . or Customer/Member." (D.I. 50 at A57) Other policies contain discretionary components. Subh contends that Wal-Mart refused to follow its policy when Subh made complaints about race and national origin discrimination, that Subh's managers inappropriately exercised their discretion by failing to investigate his numerous

28

complaints of discrimination and harassment, and, therefore, Wal-Mart cannot now invoke the policies it failed to enforce. However, the record contains no evidence that Wal-Mart failed to investigate Subh's complaints. Plaintiff's testimony to this effect appears to be nothing more than speculation;[10] his insistence that investigations did not occur is belied by the documentary record. Nor is there evidence Wal-Mart acted in derogation of any responsibility, or exhibited racial animus or animus based on national origin, in responding to Subh's actions and complaints. To the contrary, the record shows Wal-Mart treated Subh's fellow workers just as it treated Subh, despite the racial or national origin differences among them.

Furthermore, some of the very managers whom Plaintiff accuses of harboring "anti-Arab bias" (i) hired him to work in the store, (ii) trained him, (iii) gave him positive performance reviews, and (iv) gave him regular salary increases. (*See* D.I. 50 at A175; D.I. 53 at B26-27; D.I. 54; D.I. 55 at C1, C3-20.) Plaintiff's managers also chose to informally counsel Plaintiff regarding his behavior and refusal to adhere to company policy, rather than formally discipline him, on a number of occasions, in an effort to have Plaintiff succeed at Wal-Mart. (D.I. 50 at A1-3 Durst Aff., A7-8, A9-11 Ferrette Aff., A95-96) It is undisputed that "not a single offensive or even questionable remark was ever uttered by the managers Plaintiff now calls 'anti-Arab.'" (D.I. 54)

Wal-Mart argues that the facts of this case are quite similar to those in *Seabrook* v. *Gadow,* 2003 WL 21383719, at *7 (D. Del. June 10, 2003), a case in which the district court granted summary judgment to the employer. (D.I. 54) I agree. The plaintiff in *Seabrook* claimed that "the disciplinary actions against him and the denial of [leave] were not consistent with the treatment of other [employees]," and that "racial discrimination caused him to be

---

[10]The record contains only excerpts of Subh's testimony.

subjected to more severe disciplinary actions than white male [employees]." *Id.* at *6. The court

granted summary judgment on this claim because the plaintiff failed to present evidence that

other employees had been treated in a more favorable manner. *Id.* at *6-7. As an alternative

basis for summary judgment, the court further found that "given plaintiff's numerous violations

of . . . protocol . . . and directives from supervisors, defendants have demonstrated sufficient

cause for plaintiff's [adverse employment action]." *Id.* at *7.

Because I conclude that Subh has failed to establish a prima facie case of discrimination

based on race or national origin, I recommend that the Court grant Defendant's motion with

respect to Subh's discrimination claim.[11]


**Hostile Work Environment**

Subh does not specifically aver that he was subject to a "hostile work environment" in his

Complaint, using this term only in his Answering Brief. (D.I. 3; D.I. 52) However, the

Complaint does contain allegations (i.e., constant atmosphere of harassment and yelling) which

could be interpreted as Plaintiff alleging he was subjected to a hostile work environment.

Although Subh did not expressly cite "hostile work environment" as a basis for either of his

administrative Charges of Discrimination (the form does not contain a "hostile environment"

box), this claim is within the scope of the investigation that reasonably could have been expected

to arise from the Charges of race and national origin discrimination and/or retaliation. *See, e.g.,*

*Waiters,* 729 F.2d at 237 ("In determining whether Plaintiff exhausted her administrative

---

[11]Even if the Court were to conclude that Subh had established a prima facie case of
discrimination, which it has not, Subh has presented no evidence that the nondiscriminatory
reasons articulated by Wal-Mart in defense of the discipline it imposed upon Plaintiff were in
fact a pretext for discrimination.

remedies, the relevant test is whether the acts alleged in the subsequent Title VII suit are fairly

within the scope of the prior EEOC complaint, or investigation arising therefrom.") (internal

quotation marks omitted); *DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 433-34 (E.D. Pa.

2007) ("The determination turns on whether there is a close nexus between the facts supporting

each claim or whether additional charges made in the judicial complaint may fairly be considered

explanations of the original charge or growing out of it.") (internal quotation marks omitted).

Therefore, Subh adequately exhausted his administrative remedies with respect to his hostile

work environment claim.

Turning to the merits, five factors that must be proven in order to establish the existence

of an actionable hostile work environment under Title VII: (1) plaintiff suffered intentional

discrimination because of his race, ethnicity, or national origin; (2) the discrimination was severe

or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would

detrimentally affect a reasonable person in like circumstances; and (5) the existence of

respondeat superior liability. *See Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *overruled

in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). One

of these elements deserves particular emphasis here: in order to prevail on a hostile work

environment claim, a plaintiff must show that the harassment he suffered was "sufficiently severe

or pervasive to alter the conditions of [the victim's] employment and create an abusive working

environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation

marks omitted); *see also Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2008) (allegedly

offensive conduct must be "extreme" and constitute "change in the terms and conditions of

employment") (internal quotation marks omitted). In determining whether the conduct at issue is

sufficiently extreme, the totality of the circumstances – the "overall scenario" – must be

31

considered. *Caver*, 420 F.3d at 262; *see also Fuentes*, 32 F.3d at 767 ("Stray remarks by

nondecisionmakers or by decisionmakers unrelated to the decision process are rarely given great

weight . . . .") (internal quotation marks omitted); *Noel v. Boeing Co.*, 2008 WL 1999757, at *20

(E.D. Pa. May 8, 2008) ("[O]ccasional insults, teasing, or episodic instances of ridicule are not

enough – they do not permeate the workplace and change the very nature of the plaintiff's

employment.").

The Supreme Court has made clear that Title VII is not a "general civility code,"

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), and has instructed:

> Workplace conduct is not measured in isolation; instead, whether an environment
> is sufficiently hostile or abusive must be judged by looking at all circumstances,
> including the frequency of the discriminatory conduct; its severity; whether it is
> physically threatening or humiliating, or a mere offensive utterance; and whether
> it unreasonably interferes with an employee's work performance.  Hence, [a]
> recurring point in [our] opinions is that simple teasing, offhand comments, and
> isolated incidents (unless extremely serious) will not amount to discriminatory
> changes in the terms and conditions of employment.

*Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (internal quotation marks and

citations omitted).

In arguing that a reasonable factfinder could find he suffered a hostile work environment,

Subh points to: an incident in which a customer referred to him as "a sand nigger;" a co-worker,

Miller, mocking his accent; co-worker Brown stating that Subh cannot "come from another

country and expect to do things the same way" approximately three times over the course of four

months, and once saying that America was not his country and he should go home; a customer

comment that he should leave America; and a supervisor telling him that Americans are allowed

to use racial epithets against Arabs.  (D.I. 52 at 26)  Moreover, despite repeated complaints about

this hostile work environment to management and the company's Ethics Hotline, Wal-Mart

32

responded with inaction or the condoning of ill customer behavior.

Wal-Mart, however, responds by pointing, as is appropriate, to the <u>record</u> of admissible evidence. This shows, without dispute, that: the customer's deplorable use of the epithet "sand nigger" happened just once, over an approximately 15-16 month employment, and was not followed by any additional racial epithets from this or any other customer;[12] co-worker Miller was terminated for gross misconduct in connection with her treatment of Subh; Brown's statement that things are not the same here as in Subh's country of origin may simply be a non-invidious statement of fact, while the more charged statement attributed to Brown in Subh's brief – that the U.S. is not his country and he should leave – is not supported even by Plaintiff's own deposition testimony; even if considered, the incidents in which any customer recommended that he leave the country are sporadic by any measure; and, even if a supervisor told Subh it was acceptable for Americans to use racial epithets against him, there is no extensive record of this happening. In addition, while co-workers such as Brown may have had a propensity for yelling, "Title VII is not a shield against harsh treatment in the workplace." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) (internal quotation marks omitted). More fundamentally, the few remarks uttered during the course of slightly more than a year do not amount to severe or pervasive discrimination, and there is no regular conduct complained of.

It is clear that "[a] hostile work environment exists when the workplace is dominated by racial slurs, but not when the offensive conduct consists of offhand comments and isolated

---

[12]This is assuming, arguendo, that harassing conduct by customers may be appropriately considered as evidence of a hostile work environment attributable to an employer. *See Fulmore v. Home Depot, U.S.A., Inc.*, 2006 WL 839464, at *16-17 (S.D. Ind. Mar. 30, 2006) ("Several courts have held that discriminatory harassment by a customer or patron can be evidence of a hostile environment claim where the employer ratified or condoned the conduct by failing to investigate and remedy it after learning of the conduct.").

incidents." *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004); *see also*

*Boyer v. Johnson Matthey, Inc.*, 2005 WL 35893, at *16 (E.D. Pa. Jan. 7, 2005) (hostile work

environment claim may not "rely upon casual, isolated, or sporadic incidents") (internal

quotation marks and citation omitted); *Clair v. Agusta Aerospace Corp.*, 592 F. Supp. 2d 812,

822 (E.D. Pa. Jan. 7, 2009) (holding five stray remarks by co-workers during course of

twenty-one month employment did not amount to pervasive and regular discrimination as matter

of law).

Plaintiff attacks this assessment by insisting that the Court should not consider affidavits

from Wal-Mart employees because these individuals are "interested" witnesses. (D.I. 52 at 3)

But the Third Circuit has held that "in considering a motion for summary judgment the court

should believe uncontradicted testimony unless it is inherently implausible even if the testimony

is that of an interested witness." *Lauren W. v. DeFlaminis*, 480 F.3d 259, 272 (3d. Cir. 2007);

*see also Sarmiento v. Montclair State Univ.*, 285 Fed. Appx. 905, 909 (3d Cir. 2008), *cert.*

*denied*, --- U.S. ---, 129 S.Ct. 1015, --- L.Ed.2d --- (2009) (rejecting same argument advanced

here and noting "it fail[ed] to take into account that a Title VII plaintiff bears the ultimate burden

of persuasion under *McDonnell Douglas* to cast doubt on the legitimacy of an employer's

nondiscriminatory justification."). Plaintiff's argument is also self-defeating. Nearly the <u>only</u>

evidence he offers in support of his claims is his own, highly "interested" deposition testimony.

*See generally Longmire*, 2007 WL 2584662, at *11 (granting defense motion for summary

judgment on hostile work environment claim where plaintiff "relie[d] exclusively on his own

conclusory allegations – which [were] wholly and uniformly uncorroborated").

In sum, even when considered in the light most favorable to Plaintiff, there is simply

insufficient evidence from which a rational trier of fact could find that the discrimination against

Subh was pervasive or severe.  Consequently, Plaintiff has not met his burden with respect to his hostile work environment claim.  I recommend that the Court grant Defendant's motion for summary judgment on this claim.


**Retaliation**

Section 704(a) of Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made unlawful employment practice by this [subchapter], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this [subchapter]."  42 U.S.C. § 2000e-3(a).  Title VII protects individuals who file claims of discrimination, or who otherwise oppose discriminatory practices, from retaliation.  *See Curay-Cramer v. Ursuline Acad. Of Wilmington, Del., Inc.*, 450 F.3d 130, 134 (3d Cir. 2006).  Retaliation in an employment context is analyzed under the same burden-shifting rubric that is used for discrimination claims.  *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003); *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir. 1986).

To prevail on a retaliation claim under Title VII, a plaintiff must establish a prima facie case of retaliation, which requires the plaintiff to show that: "(1) [he] engaged in a protected activity under Title VII; (2) the employer took an adverse action against [him]; and (3) there was a causal connection between the employee's participation in the protected activity and the adverse employment action."  *Wilkerson v. New Media Technology Charter School Inc.*, 522 F.3d 315, 320 (3d Cir. 2008).

> If an employee establishes a prima facie case of retaliation, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action.  The employer's burden at this stage is relatively light: it is

35

> satisfied if the defendant articulates any legitimate read [sic] for the adverse
> employment action; the defendant need not prove that the articulated reason
> actually motivated the action.  If the employer satisfies its burden, the plaintiff
> must be able to convince the fact finder both that the employer's proffered
> explanation was false, and that retaliation was the real reason for the adverse
> employment action.  The plaintiff must prove that retaliatory animus played a role
> in the employer's decisionmaking process and that it had a determinative effect on
> the outcome of that process.  The burden of proof remains at all times with the
> plaintiff.

*Miller v. Delaware Probation and Parole*, 41 Fed. Appx. 581, 584 (3d Cir. 2002) (internal

quotation marks and citations omitted).  For summary judgment to be awarded, the defendant

must establish "the plaintiff's inability to raise a genuine issue of material fact as to either: (1)

one or more elements of the plaintiff's *prima facie* case or, (2) if the employer offers a legitimate

non-retaliatory reason for the adverse employment action, whether the employer's proffered

explanation was a pretext for retaliation."  *Id.* (internal quotation marks and citations omitted).

Subh has not set forth a prima facie case of retaliation.  He has failed to provide evidence

that could establish a causal link between any protected activity and the alleged adverse

employment actions – here, discipline.  In any event, even assuming Subh has presented evidence

from which a reasonable jury could conclude that the three coachings he received were retaliation

for his filing his first Charge of Discrimination – if nothing else, the timing of Wal-Mart's switch

from informal discipline prior to the Charge to formal discipline thereafter might be viewed by a

factfinder as retaliation – he offers nothing to meet his burden to show that Wal-Mart's proffered

explanations for the coachings are pretextual.  *See Choe-Rively v. Vietnam Veterans of America*

*Chapter 83*, 135 F. Supp. 2d 462, 474-75 (D. Del. 2001) (holding that plaintiff's unsupported

speculation that employer acted with discriminatory animus is insufficient to withstand summary

judgment).  "Speculation and belief are insufficient to create a fact issue as to pretext.  Nor can

pretext be established by mere conclusory statements of a plaintiff who feels that [he] has been

discriminated against." *Seabrook,* 2003 WL 21383719, at *7 (internal quotation marks omitted).

Apart from Plaintiff's uncorroborated speculation, the record shows that several different managers of diverse races and gender observed Plaintiff's unsatisfactory behavior and imposed discipline in accord with company policy. (D.I. 50, at A90-93)  The first to do so, Amakobe, was not even a direct supervisor of Plaintiff.  Moreover, as discussed previously, those fellow Associates involved in incidents also involving the Plaintiff were subject to the same discipline as Plaintiff.  There is simply not sufficient evidence from which a reasonable factfinder could find that Subh's three coachings were the result of retaliation for his filing of his first Charge of Discrimination.

**State Law Claims**

Counts II and III of the Complaint allege Wal-Mart violated Delaware's statutory protections against discrimination and retaliation in employment, 19 Del C. § 711, and intentionally inflicted emotional distress.  (D.I. 3)  I recommend that Wal-Mart be granted summary judgment on each of these claims.

Delaware's discrimination statute, 19 Del. C. § 711, prohibits employment discrimination in terms almost identical to Title VII of the 1964 Civil Rights Act. *Schuster v. Derocili*, 775 A.2d 1029, 1033 (Del. 2001); *see also Cannon v. State of Delaware*, 523 F. Supp. 341, 344 (D. Del. 1981).  Because Delaware law is construed in accordance with Title VII, all of the foregoing discussion of the deficiencies in Subh's Title VII claims applies with equal force to his state law claims.

To establish a prima facie case of discrimination under Delaware law, Subh must make the same showing as required by a claim under Title VII. *See Giles v. Family Court of Delaware*,

411 A.2d 599, 601-02 (Del. 1980). As discussed above, the Court finds that Subh has failed to raise triable issues of fact as to his Title VII discrimination claims. Thus, I recommend that the Court grant the Defendant's summary judgment motion on Subh's state law discrimination claims as well.

With respect to his intentional infliction of emotional distress claim, Plaintiff simply alleges that Defendant's actions resulted in Subh's emotional distress. (D.I. 3 at ¶17) As Subh himself states, his "intentional infliction of emotional distress claim is closely tied to his other discrimination and retaliation claims because they arise from the same operative facts." (D.I. 52 at 32)

The tort of intentional infliction of emotional distress is recognized under Delaware law. *See Barker v. Huang*, 610 A.2d 1341 (Del. 1992). "[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Mattern v. Hudson*, 532 A.2d 85, 85 (Del. Super. Ct. 1987). In *Mattern*, the Delaware Superior Court defined "extreme conduct" as conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as . . . utterly intolerable in a civilized community." *Id.* at 86. To prevail on a claim of intentional infliction of emotional distress, a plaintiff must show that the distress he suffered was "so severe that no reasonable man could be expected to endure it." *Mandelaka v. Boyd*, 1993 WL 258798, at *1 (Del. Super. June 14, 1993) (internal quotation marks omitted). Courts are to consider both intensity and duration in deciding whether the conduct has reached this level. *See id.*

Here, the record is devoid of evidence from which a reasonable factfinder could reach

38

such a finding, particularly given that Subh continued to work for Wal-Mart until April 2007, after what he claims to have been months of severe discrimination. (A94) The record indicates that Defendant's conduct toward Plaintiff cannot be characterized as outrageous; nor is there evidence of Plaintiff's severe mental distress. I therefore recommend the grant of summary judgment in favor of Defendant as to this claim as well.

## RECOMMENDED DISPOSITION

For the reasons set forth above, I recommend that Defendant's Motion for Summary Judgment be GRANTED with respect to Plaintiff's federal claim (Count I) and state claims (Counts II and III).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within ten (10) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 Fed. Appx. 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order In Non-*Pro Se* Matters For Objections Filed Under Fed. R. Civ. P. 72, dated April 7, 2008, a copy of which is available on the Court's website, www.ded.uscourts.gov/StandingOrdersMain.htm.

Dated: March 31, 2009

Honorable Leonard P. Stark
UNITED STATES MAGISTRATE JUDGE